# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS GARCIA SOLIS, | ) 1:09-cv-01592 GSA |
| | ) |
| Plaintiff, | ) **ORDER REGARDING PLAINTIFF'S** |
| | ) **SOCIAL SECURITY COMPLAINT** |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **BACKGROUND**

Plaintiff Jesus Garcia Solis ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 7 & 8.

# **FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed an application for disability insurance benefits on or about January 9, 2007, alleging disability as of April 18, 1995.  AR 103-104.  His application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 62-81.  ALJ Christopher Larsen held a hearing on November 14, 2008, and issued an order regarding benefits on March 6, 2009, finding Plaintiff was not disabled.  AR 15-22.  On January 9, 2009, the Appeals Council denied review.  AR 7-10.

**Hearing Testimony**

ALJ Larsen held a hearing on November 14, 2008, in Fresno, California.  Plaintiff appeared and testified, and was represented by attorney Melissa Proudian.  Vocational Expert Judith Najarian also testified.  AR 23-61.

Plaintiff was fifty-four years old at the time of the hearing; his date of birth is September 15, 1954.  AR 28.  He is about five feet, six inches tall, and weighs approximately 280 pounds.  AR 28.  He has adult children from a previous marriage, and lives with his current wife.  There are no children of the current marriage.  AR 29.

Following high school and a diploma earned here in the United States, Plaintiff attended a year of college.  He then went on to earn a certification in automotive repair from a private school in Arizona.  AR 30-31.  He worked in that field, primarily performing "brakes and alignments."  AR 31.  Additionally, following his injury in 1995, Plaintiff received vocational training in copy machine repair.  AR 32.  He worked in the field for two years, using light tools to repair the copy machines at the facility rather than in the field.  AR 32-33.  Plaintiff indicated that during this period he was "constantly being yelled at and embarrassed" by his superiors because he could not learn the job fast enough or perform it quick enough.  He had difficulty keeping up an adequate pace due to his medical condition.  AR 33-34.  More particularly, Plaintiff indicated he was unable to hear and/or comprehend the instructions given.  The majority

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

of the instructions given were verbal, rather than written. AR 34-35. He resigned from the position. AR 36.

Asked to explain how he was hurt originally, Plaintiff indicated that a manager threw a tire that hit him in the head and knocked him into a metal rail. AR 36. The manager did not know Plaintiff was standing below when he threw the tire from an upper rack. AR 52. Plaintiff reported that Dr. Schuyler advised him he suffered a brain injury, and Drs. Fujihara and Evans diagnosed hearing loss with vertigo, causing blurred vision and a loss of balance. AR 36. As a result of his workplace injury, Plaintiff received a settlement through workers' compensation of approximately $25,000. AR 37.

Plaintiff does not believe he can work at any job for eight hours a day, five days a week. He holds this belief because he is unable to maintain his balance, has trouble sleeping, and suffers from depression "and fear." He continues to suffer from ringing in his ears, hearing loss in his left ear and headaches. AR 38.

More particularly with regard to balance, Plaintiff indicated he must lean on walls or counters to sustain his balance on a daily basis. He is "constantly spilling food" and dropping and breaking glassware at home. He loses his balance "all the time." AR 39. He does not use a cane however because he is afraid he will trip over it and fall. AR 40. Plaintiff would be unable to walk half a block without having to steady himself against an object. He has been told there is nothing more that can be done, and he does not take any medication for this condition. AR 40.

While Plaintiff has a valid California driver's license, he has rarely driven since 1999 or 2001. His wife does the driving. AR 29-30.

When Plaintiff was asked about a gap in his medical treatment, he explained that he became "a hermit" as a result of his condition. This is due to depression and fear and his lack of trust. He has suffered from hallucinations since his employment at the copy repair service, and his sleep has been disturbed as well. The minute he falls asleep he is attacked by "bears, tigers, a black panther, a dog, raving dog . . .." AR 41. He is not sure he is dreaming because the episodes are so real. AR 42. Plaintiff believes "someone" is breaking into his home and his cars. He has called the police to report this activity but no one is ever found. AR 48-49. Plaintiff

indicated he wrote a letter to Governor Schwartzenegger because he believes someone has planted something in his ear or ears that creates a clicking or humming noise. AR 49. He also believes members of the police department and district attorney's office may be behind these activities. AR 49.

Plaintiff is currently under the care of a psychiatrist at Kaiser. Apparently he saw the physician right after his accident or injury, and then resumed seeing him in October 2008. Plaintiff explained the gap in treatment is the result of becoming "a hermit" and losing all contact with the outside world. AR 50. He sees neither friends nor family. AR 50. Asked whether he has ever had suicidal thoughts, Plaintiff says he has them "about once a month in [his] dreams." AR 51. He feels depressed all the time. He has difficulty concentrating or focusing his attention, and the longest period of time he could concentrate is about an hour. AR 51. Thereafter however, he would be "really exhausted, tired, fatigued" and would have to take a thirty-minute nap. AR 51-52.

Plaintiff last worked in 1999. Shortly after leaving the copy machine repair business, he was hired to prep new cars prior to sale at the Selma Auto Mall. However, when he appeared for his first day of work, he was advised to go home because the company's insurance carrier had deemed him uninsurable. AR 42-43, 55.

On the date of the hearing, Plaintiff was using a wheelchair due to pain and numbness in his hands and feet. He indicated he had been using the wheelchair for over a year, however, it had not been prescribed for him. He clarified that he does not use the wheelchair at home, rather, he uses it when he goes out. AR 43. When asked how he gets around outside, Plaintiff indicated he does not go outside due to his balance and "condition." AR 44.

With specific regard to headaches, Plaintiff suffers from headaches one or twice a week. The headaches will last a half hour to an hour and he takes over the counter medication to treat the symptoms. Sometimes a hot shower will help. AR 44.

A typical day for Plaintiff will involve watching television, eating a bowl of cereal, and using the computer. AR 45. Plaintiff goes "from the couch to the bed most of the time and the

TV and the computer." AR 45-46.  He naps or rests throughout the day, sometimes taking two or three thirty-minute naps per day.  AR 46.

He has constant ringing in his left ear.  When asked whether he has ever had to wear a hearing aide, Plaintiff indicated that Dr. Evans had never suggested it.  AR 46-47.

VE Najarian testified that Plaintiff's past work as a front end mechanic and brake mechanic was medium and level six skilled work, performed at a very heavy level.  AR 54.  Plaintiff's past work as an office machine servicer is light and level seven skilled, performed at a medium level.  AR 55.

In the first hypothetical, the VE was asked to assume a worker of Plaintiff's same age, education and work experience, who can perform simple, repetitive tasks, but can never climb ladders, ropes or scaffolds, or work at any height more than five feet off the ground, and the worker must avoid concentrated exposure to noise.  AR 55.  VE Najarian testified that the hypothetical worker would be unable to perform Plaintiff's past relevant work, however, the worker could perform the work of a mail clerk or sorter (DOT 209.687-026), copy clerk or photocopy operator (DOT 207.685-014) or price marker (DOT 209.587-034).  There are approximately 8,063, 6,633 and 15,788, respectively, of such positions in California.  National numbers are figured by multiplying the state figure by nine.  AR 56-57.

In a second hypothetical where the worker was restricted to limited contact with the general public, the VE testified that the answer would remain the same: the hypothetical worker remained capable of performing the aforementioned positions.  AR 57.

In a third hypothetical, wherein the hypothetical worker was unable to complete an eight-hour workday or a forty-hour workweek without interruption from psychologically based symptoms, the VE indicated that such a worker would be unable to perform any work.  AR 57-58.  VE Najarian indicated her testimony was consistent with the Dictionary of Occupational Titles and Selected Characteristics of Occupations.  AR 59.

In a hypothetical posed by Plaintiff's counsel, VE Najarian was asked to consider the hypothetical worker in the ALJ's first example, limited further by an inability to "walk without balance problems and had to hold onto things or needed stability of some sort, assistive device or

other things." The VE responded that the requirement of an assistive device would limit the worker to sedentary positions, rather than those that required standing or walking. AR 58-59.

**Medical Record**

The entire medical record was reviewed by the Court. Those records relevant to the issues on appeal are summarized below. Otherwise, the medical evidence will be referenced as necessary in this Court's decision.

*Allen M. Evans, M.D.*

Plaintiff was treated at the Central California Ear Nose and Throat Medical Group by Otolaryngologist Dr. Evans from 1995 to 2001.

In an examination of June 22, 1995, Dr. Evans reported to California Indemnity Insurance Company (CIIC) that Plaintiff advised he had been hit behind the head on April 18 after a tire fell from a height of ten to fifteen feet. He sustained a fracture of his anterior incisor teeth that required repair. Plaintiff reported that did not lose consciousness, but was very dazed and became acutely dizzy an hour after the incident. He suffers from ringing and decreased hearing in his left ear. The dizziness has improved since the incident but it has not fully resolved. An ABR[3] test and two MRI scans were normal with the exception of possible hemorrhage in the left mastoid cavity. The doctor's examination revealed normal findings regarding Plaintiff's eyes, nose, oral cavity, hypopharynx/larynx, and neck. AR 196. His ears were clear. There was a tendency to fall backwards on the Romberg test and Plaintiff fell to the left on tandem gait. Audiometry results were normal in the right ear, with a 40-50 db hearing loss in a frequency from 1500 to 8000 Hertz. Dr. Evans' impression was a head injury with a secondary loss on the left side, and vertigo with slow improvement. The doctor recommended a high resolution CT scan of the temporal bone to rule out a base of skull fracture. AR 196-197, 198-204.

Dr. Evans reported on July 27, 1995, that Plaintiff had undergone ENG testing, and the results indicated peripheral vestibular dysfunction localized to the left ear.   Significant improvement had occurred with the exception of sudden head movement. The doctor

---

[3] "ABR" refers to the auditory brainstem response test. *See* http://medical-dictionary.thefreedictionary.com/ABR+test

6

recommended Plaintiff resume work activities with the exception of climbing ladders and avoiding heights. AR 194-195.

In a report dated October 12, 1995, the doctor noted that Plaintiff reported improvement regarding dizziness, with occasional acute vertiginous episodes. Plaintiff complained of short term memory loss. Examination revealed clear ears and no nystagmus. Romberg testing was normal, but he was unsteady on tandem gait. The doctor's impression was head trauma with secondary clinical labyrinthine concussion. The doctor recommended that Plaintiff return to work with the exception of climbing ladders or high structures. AR 191-192.

On October 27, 1995, Dr. Evans noted Plaintiff's marked improvement, lack of dizziness and the fact his gait had improved "100%." He was cleared to return to work, with a single restriction to avoiding structure heights over five feet. AR 190.

On November 21, 1995, Dr. Evans reported to CIIC that upon examination Plaintiff's left ear had a small amount of fluid in the middle ear cavity; the right ear was clear. No evidence of nystagmus was present. Plaintiff remained slightly unsteady on gait, but did not fall. The doctor's impression was post traumatic labyrinthine and cerebral concussion with slow progressive improvement in clinical symptoms. Dr. Evans recommended Plaintiff continue to perform vestibular exercises and that he return to work. AR 188-189.

In a report dated January 2, 1996, to CIIC, Dr. Evans indicated Plaintiff continued to complain of memory problems, intermittent dizziness with mild balance issues. Plaintiff reported overall improvement. Dr. Evans' examination revealed normal findings for the head and eyes. The left tympanic membrane perforation had totally healed and the right ear was within normal limits. Findings regarding the nose, oral cavity, and neck were all normal. It was noted that Romberg testing was normal, yet Plaintiff had "significant problems with tandem gait." AR 186. Head injury with secondary labyrinthine contusion as well as cerebral concussion with persistent mild vertigo and disequilibrium were the doctor's impression. AR 186. He recommended Plaintiff avoid climbing ladders and anything over five feet in height. The injury was considered to be permanent. AR 187.

On March 1, 1996, Dr. Evans' report to CIIC reflected that Plaintiff complained of nausea, headaches, dizziness and balance disturbances. The doctor's examination revealed no significant nystagmus. Plaintiff could not perform tandem gait, as he fell to either the right or left. Romberg testing was normal, as were nasal and oral cavity examinations. A previous perforation to the tympanic membrane had healed. Dr. Evans' impression included chronic vertigo with disequilibrium after a head trauma; it was noted Plaintiff continued to experience disequilibrium and dizzy spells. The doctor recommended Plaintiff be considered to be retrained for a sedentary type job that did not require any climbing or sudden movements. AR 184-185.

On June 5, 1996, Dr. Evans noted Plaintiff was stable, but complaining of ongoing bouts of disequilibrium and spells of vertigo. His ears were clear, and no nystagmus was present. A slight wobble was detected on Romberg. AR 193.

In a report dated November 13, 1996, Dr. Evans reported Plaintiff's symptoms were "somewhat stable." He had difficulty walking and stumbled in the dark, had intermittent blurred vision and headaches, and persistent tinnitus in the left ear. On examination, Plaintiff ears were clear and nystagmus was not present. Plaintiff was unable to perform tandem gait, falling to the left. Romberg testing was stable with a slight wobble. Dr. Evans' impression involved head trauma with secondary vertigo and disequilibrium, unchanged for six months. AR 182-183.

On March 5, 1997, Dr. Evans' report to CIIC reflects Plaintiff's condition showed neither significant improvement nor worsening. Plaintiff's hearing loss was severe to profound in the left ear. The doctor's impression included chronic vertigo with disequilibrium and hearing loss secondary to head trauma. His condition was considered to be permanent and stationary, and it was noted Plaintiff would likely need a hearing aid in the future. AR 180-181.

In a report dated April 19, 1997, Dr. Evans's report to CIIC reflects Plaintiff complained of continued difficulty hearing. The doctor's examination revealed his ears were clear bilaterally, and the oral and nasal cavities were normal. Plaintiff was unable to perform tandem gait without difficulty as he tended to fall to the right. The doctor's impression was severe, high frequency, sensorineural hearing loss with fair to good discrimination scores. He recommended bilateral hearing aids. AR 178-179.

On October 3, 1997, Dr. Evans prepared a report for CIIC wherein he indicated Plaintiff suffered from chronic vertigo, and continued to complain of memory loss and depression following his industrial accident. Dr. Evans' examination revealed Plaintiff's ears to be clear and nystagmus was not present, however, Plaintiff remained unable to perform tandem gait. Audiometric testing showed "remarkable improvement" as the hearing in both ears tested within normal limits. AR 176. Dr. Evans' impression was a labyrinthine concussion with persistent vertigo, unchanged for several years. It was the doctor's recommendation that Plaintiff see a neurologist for continued treatment. AR 176-177.

### *Bradley A. Schuyler, Ph.D.*

Psychologist Bradley A. Schuyler treated Plaintiff in 2001. Progress notes indicated Plaintiff was initially seen on July 19, 2001, wherein Dr. Schuyler noted it was "clear" that Plaintiff was "suffering from paranoid delusions . . .." The doctor questioned "the neurological etiology" for Plaintiff's psychiatric problems. Personality testing was completed that date. AR 151. The following day, Plaintiff returned and Dr. Schuyler opined following another interview that Plaintiff had suffered a concussion in the industrial injury that was "consistent with a left hemisphere injury" that likely went undetected where the focus of his earlier treatment was vertigo. The doctor believed Plaintiff's paranoia had an organic etiology. AR 151. On July 27, 2001, Dr. Schuyler interviewed Plaintiff's wife, who reported that Plaintiff suffered from significant balance problems, memory problems and paranoia. Plaintiff's wife indicated there were no such problems prior to Plaintiff's industrial injury. Neuropsychological testing was approved by Plaintiff's attorney in the workers' compensation action. AR 151. It appears Dr. Schuyler conducted a number of tests, however, only raw numerical data appears in the medical record. *See* AR 152-153.

### *Psychiatric Review Techniques*

State agency physician Archimedes Garcia, M.D., performed a psychiatric review on or about March 19, 2007. He found insufficient evidence of any mental impairment, nor did he assign any functional limitations in any area. AR 207-217.

State agency physician S. Bortner, M.D., performed a psychiatric review on July 20, 2007. Dr. Bortner also found insufficient evidence of any mental impairment. No functional limitations were identified. Dr. Bortner expressly noted a lack of evidence of any psychiatric impairment greater than non-severe and persisting for twelve months at a "continuously disabling severity." AR 223-235.

### *Kaiser Permanente*

Psychiatrist Markham Kirsten saw Plaintiff on October 10, 2008, at Kaiser Permanente. The notes indicates the doctor last treated Plaintiff "over 10 years ago." AR 239. More particularly, Dr. Kirsten indicated that a past diagnosis of about eleven years ago included major depression disorder and treatment with Prozac. The doctor opined Plaintiff may have a personality disorder, but had never been hospitalized. AR 239. On the date of examination, Plaintiff was alert, oriented and coherent. It was noted he appeared "quite dysphoric." Speech was normal and no hallucinations or delusions were evident, yet concentration was impaired. AR 239. Dr. Markham noted Plaintiff's fund of knowledge was impaired, as were his short and long term memory. Impulse control was poor, however, judgment was good. AR 239. Dr. Markham's diagnoses included major depression, severe with psychosis, a GAF[4] score of 41 to 50, and a cognitive disorder. The doctor's plan included prescriptions for Prozac and Seroquel, as well as an intensive outpatient therapy program. AR 240.

On October 10, 2008, Plaintiff was seen by Vincenta M. Leigh, R.N. A reports indicates Plaintiff was referred by a psychiatrist for the intensive outpatient program. Plaintiff reported difficulty sleeping, visions of wild animals and menacing dogs, as well as Jesus and Satan. AR 242. With regard to mental status, the nurse noted Plaintiff's speech was normal, mood was depressed, affect was restricted and thought process was logical. He was fully oriented and his attention was fair. Concentration was noted to be impaired. Memory was intact. AR 243. Plaintiff denied suicidal or homicidal ideation. AR 244. Nurse Leigh was unable to complete

---

[4]The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").

the intake or assessment because Plaintiff "left" because he was "too sleepy" from medication. AR 242.

**ALJ's Findings**

The ALJ determined that Plaintiff had not engaged in substantial gainful activity after October 1999, and had the severe impairments of disequilibrium status post-head injury, depressive disorder, high-frequency sensory-neural hearing loss and obesity. AR 17. Nonetheless, the ALJ determined that none of the severe impairments met or exceeded one of the Listing impairments. AR 17-18.

Based on his review of the medical evidence, the ALJ determined that Plaintiff had the RFC to perform work at all exertional levels but could never climb ladders, ropes or scaffolds, could never work more than five feet off the ground, and must avoid concentrated exposure to noise, coupled with the ability to perform simple repetitive tasks. AR 18-20. The ALJ found Plaintiff was unable to perform his past relevant work. AR 20. Nevertheless, the ALJ determined that Plaintiff had the RFC to perform other jobs that exist in significant numbers in the national economy. AR 20-21.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the

Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

### **REVIEW**

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since October 1999; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) was unable to perform his past relevant work; yet (5) retained the RFC to perform other jobs that exist in significant numbers in the national economy. AR 15-22.

Here, the Court interprets Plaintiff's arguments to be that (1) the ALJ's findings are not supported by substantial evidence; (2) that state agency or court findings that Plaintiff is disabled are controlling; and (3) that the opinions of Vocational Rehabilitation Counselor Rick Sarkisian and Glen Fujihara, M.D., were not properly considered. (Docs. 18, 19 & 22.)

# DISCUSSION

**A.    *Plaintiff's Severe Impairments***

A plaintiff bears the burden of proving that he or she is disabled. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999); 20 C.F.R. § 404.1512. The mere diagnosis of an impairment is not sufficient to sustain a finding of disability. *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985); *see also Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability).

A person is disabled if his impairments are severe and meet the durational requirement of twelve months. 20 C.F.R. §§ 404.1505, 404.1520(a). A severe impairment is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Examples of basic work activities include carrying out simple instructions, responding appropriately to usual work situations, dealing with changes in a routine work setting, and performing ordinary physical functions like walking and sitting. 20 C.F.R. § 404.1521(b).

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at step two if the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Social Security Ruling ("SSR") 85-28. In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basis work activities. SSR 96-3p. The step two inquiry is a *de minimis* screening device to dispose of groundless or frivolous claims. *Bowen v. Yuckert,* 482 U.S. 137, 153-154 (1987).

ALJ Larsen considered the following at step two after making a determination that Plaintiff's disequilibrium status post-head injury, depressive disorder, high-frequency sensory-neural hearing loss, and obesity were severe impairments:

> I have considered the impairments listed in Appendix 1, Subpart P, CFR Part 404, most nearly applicable to Mr. Solis's medically determinable impairments, particularly sections 2.07, 2.08, 12.02 and 12.04, including the effects of obesity. I conclude Mr. Solis does not meet or medically-equal any of them under the facts of this case.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Mr. Solis's mental impairment did not meet or medically equal the criteria of listings 12.02 or 12.04. In making this finding, I have considered the "paragraph B" criteria. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A "marked" limitation means more than "moderate" but less than "extreme." "Repeated episodes of decompensation, each of extended duration," means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> There was insufficient evidence for the state-agency medical consultants in psychiatry to perform a psychiatric review technique and rate functional limitations that existed before the date-last-insured. Therefore, I conclude Mr. Solis had mild restrictions in activities of daily living and social functioning, because he was able to work in an office setting repairing business machines and he performed household tasks. I conclude he had moderate difficulties with regard to concentration, persistence and pace. He was able to learn to repair office machines through on-the-job training, but, according to his testimony, his employment ended because he could not learn fast enough. Mr. Solis reported memory problems to psychologist Dr. Schuyler and treating physician Dr. Evans. The medical records show no episodes of decompensation which have been of extended duration during the relevant period.
>
> Because Mr. Solis's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, he does not satisfy the "paragraph B" criteria. I have also considered the "paragraph C" criteria. In this case, the evidence fails to establish the "paragraph C" criteria.
>
> The limitation identified in the "paragraph B" criteria are not a residual functional capacity assessment. Instead, I use them to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation requires a more detailed assessment, itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, my residual functional capacity assessment reflects the degree of limitation I have found using the "paragraph B" criteria.

AR 17-18, internal citations omitted. This Court finds that ALJ Larsen carefully examined the medical findings and made an informed judgment about the limitations and restrictions faced by Plaintiff. SSR 96-3p.

In contrast, at step four, further evaluation of the claimant's inability to work is made based on an analysis of the claimant's residual functional capacity[5] ("RFC") and an assessment of other vocational factors. 20 C.F.R. § 404.1520(a).

When considering his RFC finding, ALJ Larsen expressly referenced and discussed the medical record in this case. The ALJ considered the entire record in making his determination that Plaintiff is capable of performing work at all exertional levels with the following limitations: never climb ladders, ropes or scaffolds; never work more than five feet off the ground; avoid concentrated exposure to noise; and simple, repetitive tasks. ALJ Larsen's findings state:

> In making this finding, I have considered all Mr. Solis's symptoms, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . ..
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> Mr. Solis alleges he is disabled due to vertigo, memory loss, and hearing problems caused by a brain injury in 1995. He testified he also has blurred vision, trouble sleeping, and has to use the walls to keep his balance when walking. The longitudinal medical records of treating otolaryngology specialist Dr. Evans confirmed that as a result of the injury, Mr. Solis had vertigo and hearing loss on the left. He reported an MRI scan was consistent with hemorrhage within the mastoid. According to an ENG performed on July 17, 2005, Mr. Solis had peripheral vestibular dysfunction in the left ear and possible ocular motor dysfunction. Hearing loss in the left ear was identified.
> Although Mr. Solis's vestibular symptoms improved, he still had vertigo spells, continued to have balance problems, and experienced intermittent dizziness. It was hard for him to walk a straight line. In April, 1997, Mr. Solis was complaining of hearing loss in his left ear. He told Dr. Evans he had problems understanding what was being said and often missed instructions at work. In his October 3, 2007, final report, Dr. Evans stated Mr. Solis's hearing had improved such that hearing in both ears was within normal limits, but he still had short-term memory loss and persistent vertigo. I give substantial weight to Dr. Evans' opinion that Mr. Solis is precluded from climbing ladders or performing work at a height more than 5 feet off the ground. The state-agency medical consultants agreed with Dr. Evans, noting they had little functional information from the relevant time period on which to base an opinion. There is no medical evidence to support Mr. Solis's contention that he could not walk without steadying himself, or that he needed a wheelchair or assistance before the date-last-insured.

---

[5]Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or equivalent work schedule. SSR 96-8p. The RFC assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Social Security Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

> Mr. Solis testified he stopped working in 1999 as he was being yelled at because he could not learn or understand fast enough to adequately do his job. In 2001, he was evaluated by psychologist Dr. Schuyler, who opined Mr. Solis was having "paranoid delusions" possibly linked to being hit in the head by a tire. Dr. Schuyler administered a battery of tests, but there is no report of the results, only raw scores. Therefore, I give little weight to Dr. Schuyler's opinion that Mr. Solis has an organic mental disorder, because he did not interpret the test data, or explain how Mr. Solis's ability to work was affected.
>
> There is no record of psychological treatment thereafter until October, 2008, when Mr. Solis saw Dr. Kirsten at Kaiser. According to Dr. Kirsten, about 11 years previously, he had diagnosed Mr. Solis with a major depressive disorder and prescribed Prozac for several years. Although Dr. Kirsten reported his opinion that Mr. Solis was experiencing recurrent major depression with psychosis at the time of his October, 2008, evaluation, there is no medical evidence to determine how this mental impairment impacted his ability to work before the date-last-insured as the charts are in storage. . . .
>
> The state-agency medical consultants concluded there was insufficient evidence of a psychiatric impairment before the date-last-insured, and correctly pointed out that there is no functional assessment or mental status examination in the record within the relevant period. I will give substantial weight to Mr. Solis's testimony and to the opinion evidence of his wife regarding short-term memory loss to limit Mr. Solis to simple repetitive tasks, as this is partially supported by Dr. Evans and Dr. Schuyler. However, I agree with the state-agency medical consultants that there is no medical basis to determine additional limits on residual functional capacity due to mental impairments.

AR 19-20, internal citations omitted.

To the degree Plaintiff's brief can be interpreted to argue that the ALJ failed to account for all of his medically determinable severe impairments and their impact upon his ability to engage in basic work activity, it lacks merit. The ALJ considered all of Plaintiff's various complaints of pain at step four.

Thus, the ALJ's determination is supported by substantial evidence and based upon proper legal standards.

**B.   *State Disability Findings***

Plaintiff alleges that where the California Court of Appeal, Fifth Appellate District, found he was "disabled according to State and Federal law," including the Americans with Disabilities Act, and that those findings should be sufficient to support a finding of disability for purposes of Social Security disability benefits and this proceeding. (Docs. 19 & 22.) The Commissioner counters that he is not bound by disability determinations made by other entities, and therefore, the ALJ's findings are proper. (Doc. 20 at 10-11.)

The Commissioner is not required to give effect to opinions in state court proceedings. *See, e.g., Cruz v. Gardner*, 375 F.2d 453, 456 (7th Cir. 1967) (citing *Alger v. Celebrezze*, 267 F.Supp. 51 (S.D. Ind. 1965)); *Duncan v. Massanari*, 200 F.Supp.2d 1068, 1073 (E.D. Mo. 2001). Generally, federal courts defer to the federal administrative agencies in their interpretation of applicable federal regulations. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)), cert. denied, 531 U.S. 871, 121 S.Ct. 172, 148 L.Ed.2d 117 (2000). Additionally, it is well-settled in the Ninth Circuit that while the state's workers' compensation guidelines are not conclusive in a Social Security case, "the ALJ is entitled to draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (citing *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988) & quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)); *see also McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (a VA disability rating does not compel the Social Security Administration to reach an identical result).

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on [the Social Security Administration].

20 C.F.R. §§ 404.1504 & 416.904.

Here, ALJ Larsen was not bound by the findings of the state appellate court regarding Plaintiff's disability. Nonetheless, it appears the ALJ was aware of the disability findings related to Plaintiff's 1995 workers' compensation case following an industrial injury. This Court finds the ALJ drew proper inferences logically flowing from the medical evidence available. As previously discussed, the medical evidence does not support a finding of disability pursuant to the five step sequential analysis employed by the Social Security Administration.

**C.**   ***Treating Sources & Physicians***

Plaintiff complains that Vocational Rehabilitation Counselor Rick Sarkisian and Glen Fujihara, M.D., found him to be disabled (Doc. 19), and as a result, he is entitled to Social Security disability benefits. Defendant counters that Mr. Sarkisian's treatment records were not a

part of the record considered by the ALJ. In any event, Defendant contends the opinion of a vocational rehabilitation counselor is not a proper medical source. Finally, Defendant asserts that the records of Dr. Fujihara were also not a part of the medical record considered by ALJ Larsen, and further, that had those records been considered, the determination would not have changed. (Doc. 20 at 11-12.)

### 1. Vocational Rehabilitation Counsel

As Defendant points out, the record in this matter does not contain any materials relating to Plaintiff's treatment by Rick Sarkisian. It is a claimant's burden to produce full and complete medical records, not the Commissioner's. *Meanel v. Apfel,* 172 F.3d at 1113. Therefore, the ALJ could not have erred by failing to consider a report that had not been provided to him for consideration in the first instance. Additionally, Plaintiff was represented by attorney Melissa Proudian who agreed during the administrative proceedings that the record to be considered by the ALJ was complete. AR 26. Lastly, the record was not ambiguous in any way such that the ALJ's duty to develop the record further was triggered. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (holding that ALJs have a duty fully and fairly to develop the record only when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence). Here, the medical record is more than adequate for purposes of a disability determination.

Moreover, a vocational rehabilitation counselor is not an "acceptable medical source." 20 C.F.R. §§ 404.1513(a). Instead, Mr. Sarkisian is considered to be an "non-medical source." *See* SSR 06-03-p (non-medical sources include "rehabilitation counselors"). Information from these "other sources" cannot establish the existence of a medically determinable impairment, according to SSR 06-3p. Rather, there must be evidence from an acceptable medical source for this purpose.

Thus, even had ALJ Larsen had this evidence to consider, he was not required to give any deference to Mr. Sarkisian's findings, and therefore, the ALJ's findings are supported by substantial evidence and are free of legal error.

**2.    Glen Fujihara, M.D.**

Plaintiff argues that Dr. Fujihara determined his various impairments limit his ability to participate in "major life activities" and are "disabilities pursuant to both ADA and California Government code 12626 (k)." (Doc. 19.) Defendant contends the records were not available for consideration, and more importantly, had the records been available, they would pre-date 1999, the date Plaintiff last worked. (Doc. 20 at 11-12.)

Again, as Defendant points out, Dr. Fujihara's records are not a part of the medical record considered by ALJ Larsen. In general it is the duty of the claimant to prove to the ALJ that he is disabled. 20 C.F.R. § 404.1512(a). To this end, he must bring to the ALJ's attention everything that supports a disability determination, including medical or other evidence relating to the alleged impairment and its effect on his ability to work. *Id.* As previously indicated, Plaintiff was represented by an attorney in the disability proceedings below. Ms. Proudian expressly agreed on the record that the medical evidence was sufficient and complete. *See* AR 26.

ALJ Larsen conducted a thorough review of the entire record and thereafter made a disability determination which is supported by substantial evidence. Upon complete evaluation of the evidence, particularly in light of the date last insured, the available medical record following Plaintiff's industrial accident, and his ability to maintain employment for years following the accident, the ALJ obviously determined that the record was adequate to make a determination. Under these circumstances, the ALJ had no duty to further develop the record.

In sum, the ALJ's findings are supported by substantial evidence and are free of legal error.

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in

favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Jesus Garcia Solis.

IT IS SO ORDERED.

Dated:   **December 23, 2010**                         /s/ **Gary S. Austin**
                                                              UNITED STATES MAGISTRATE JUDGE